# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LESLIE CRIM,                                    Case No. 1:11-cv-137

      Plaintiff,                            Dlott, C.J.
                                               Bowman, M.J.

      v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Leslie Crim filed this Social Security appeal on behalf of deceased claimant Michael Saylor, the father of her dependent children, in order to challenge the Defendant's finding that he is not disabled.[1]  *See* 42 U.S.C. §405(g).  Proceeding through counsel, Plaintiff presents four claims of error for this Court's review.  For the reasons explained below, I conclude that this case should be REMANDED because the finding of non-disability is not supported by substantial evidence in the administrative record.

## I. Summary of Administrative Record

In November 2006, Mr. Saylor filed an application Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) alleging a disability onset date of January 2, 1994 due to both physical and mental impairments.[2]  After Mr. Saylor's claims were denied

---

[1] Mr. Saylor passed away in January 2011.  (Doc.13, Ex. 1, "Affidavit of Leslie Crim").  Mr. Saylor's death certificate lists his cause of death as acute Methadone, Codeine, Oxycodone, and Diazepam Intoxication.  *Id.*  Ms. Crim, on behalf of Mr. Saylor's minor children, now seeks judicial review pursuant to section 205(g) of the Act. See 42 U.S.C. §§ 405(g), 1383(c)(3).

[2] Agency regulations provide that children of deceased claimants can make a claim for DIB underpayments, but not SSI underpayments, that may have been owed to the deceased

initially and upon reconsideration, he requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). On July 29, 2009, an evidentiary hearing was held, at which Mr. Saylor was represented by counsel. (Tr. 26-72 ). At the hearing, the ALJ heard testimony from Mr. Saylor, Ann Turner, Mr. Saylor's case manager, and Donald Schry, an impartial vocational expert. On August 25, 2009, ALJ Deborah Smith denied Mr. Saylor's application in a written decision. (Tr. 13-25).

The record on which the ALJ's decision was based reflects that Mr. Saylor was 26 years old on his alleged disability onset date, and had a 9th grade education. (Tr. 23, 156). He had past relevant work as a fast food worker and lathe operator and last worked in 2003. (Tr. 23).

Based upon the record and testimony presented at the hearing, the ALJ found that Mr. Saylor had the following severe impairments: "anxiety/panic disorder, a bipolar disorder, and alcohol/marijuana abuse reportedly in remission (but continued abuse is suspected)." (Tr. 17). The ALJ concluded that none of Mr. Saylor's impairments alone or in combination met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subp. P, Appendix 1. Despite these impairments, the ALJ determined that Mr. Saylor retains the RFC to perform a full range of work, with the following nonexertional limitations:

> He can understand, remember, and carry out simple and somewhat complex tasks. Symptoms interfere with the ability to sustain close, consistent attention to detail. He can make simple decisions. He can relate to coworkers and supervisors on a superficial and occasional basis only, and would be unable to deal with the public in a reliable manner, so he should avoid public contact. The claimant can deal with occasional changes in routine. He would require a calm, consistent setting with clear performance

claimant. *See* 20 C.F.R. §§ 404.503, 416.542. Therefore, only the denial of Mr. Saylor's DIB application is at issue in this appeal.

2

expectations and minimal interpersonal demands.

(Tr. 20). Based upon the record as a whole including testimony from the vocational expert, and given Mr. Saylor's age, education, work experience, and RFC, the ALJ concluded that, while the Mr. Saylor is unable to perform his past relevant work, he can nonetheless perform jobs that exist in significant numbers in the national economy. (Tr. 24). Accordingly, the ALJ determined that Mr. Saylor is not under disability, as defined in the Social Security Regulations, and is not entitled to DIB or SSI. (Tr. 24).

The Appeals Council denied Plaintiff's request for review. Therefore, the ALJ's decision stands as the Defendant's final determination. On appeal to this Court, Plaintiff maintains that the ALJ erred by: 1) failing to properly follow agency regulations in weighing the opinion evidence; 2) improperly relying on the opinions of the non-examining physicians in formulating Mr. Saylor's residual functional capacity (RFC); 3) failing to find that Mr. Saylor's impairments met or equaled Listing 12.06; and 4) failing to provide a thorough explanation of his RFC finding in violation of SSR 96-8p. Upon careful review and for the reasons that follow, the undersigned finds Plaintiff's assignments of error to be well-taken.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform

his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

**B. Evidence of Record and ALJ Decision**

Plaintiff's Statement of Errors focuses solely on the ALJ's evaluation of Mr. Saylor's mental impairments and does not challenge the ALJ's findings relating to his physical limitations. Specifically, Plaintiff argues that the ALJ erred in discounting the findings of Mr. Saylor's treating psychiatrist, Dr. Hickert. Plaintiff further asserts that the ALJ failed to give controlling weight to the opinion of Dr. Katz, the non-examining consultant.

*1. Relevant Record Evidence*

In 1995, when Saylor was 17, he was admitted to Children's Psychiatric Hospital of Northern Kentucky for three nights. (Tr. 238-242). He was diagnosed with Adjustment Disorder with Mixed Disturbance of Mood and Conduct. (Tr. 239). He was initially assigned a Global Assessment of Functioning (GAF) GAF[3] score of 40. (Tr. 242. ) His GAF on discharge was 50. (Tr. 239).

Mr. Saylor worked for 20 different employers from 1996 to 2003. The only job he held for a sustained period was at Subway, where he worked as as a cashier and a prep

---

[3] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with a score of 50 as having "severe symptoms ... or serious impairment in social, occupational, or school functioning." *Id.*

cook.  (Tr. 34.)  Notably, Mr. Saylor testified that he would be unable to come to work at least once a week because of his anxiety and was able to remain employed at Subway solely due the kindness of the owner at that time.  (Tr. 46-48)  Mr. Saylor further testified that he once locked himself in the freezer for three hours after getting overwhelmed by waiting on the customers.  (Tr. 46).  After that incident, the owner at the time, permitted Mr. Saylor to "sit in the back and cut lettuce all day, just sit there and cut lettuce until I could do my normal job which would be cashiering, food prep and making sandwiches."  (Tr. 47).  Mr. Saylor testified that he had to quit his job at Subway after the restaurant was purchased by a new owner who would not accommodate Saylor's anxiety, social phobias, and avoidant behaviors.  (Tr. 47, 48).  From 2000 through 2003, Saylor tried 12 different jobs after leaving Subway, including at least four temporary agencies, but he could not hold a job.  (Tr. 140-144).

In June 2005, the police took Saylor to Dearborn County Hospital because of suicidal thoughts and his possession of a gun.  (Tr. 269, 273).  After treatment in the Dearborn County Hospital emergency room, Saylor was transferred to Community Mental Health Center (CMHC) of Dearborn County and admitted for Depressive Disorder NOS, Anxiety Disorder NOS, Alcohol Dependence v. Abuse, and Cannabis Dependence.  (Tr. 274, 288). His GAF was 48.  (Tr. 288).  His blood work was positive for THC.  (Tr. 288).

Mr. Saylor followed up with outpatient treatment at CMHC in August of 2005.  (Tr. 291- 293).  Treatment notes from Plaintiff's initial evaluation at CMHC, detail Mr. Saylors long history of anxiety symptoms.  At that evaluation Mr. Saylor reported excessive worry and difficulty controlling worrying since he was a teenager.  He further noted restlessness, decreased concentration disturbed sleep and persistent concerns about having additional

panic attacks. *Id.* He worried about the implications of his attacks. *Id.* The treatment notes further indicate that Plaintiff "reported anxiety at being in a place or situation in which help may not be available in the event of having an unexpected panic attack or panic-like symptoms. Patient reports he avoids situations in which he may have panic attacks." *Id.*

Thereafter, Mr. Saylor met Ms. Crim in 2006 and they started a relationship. As a result of Ms. Crim's support, Mr. Saylor tried to work again in September of 2006. (Tr. 50). Saylor attempted to work at Arby's as a prep cook. (Tr. 50). He left Arby's after a "couple of weeks" because the job overwhelmed him. (Tr. 313-314).

In January 2007, Saylor applied for Medicaid and was evaluated at Mental Health Access Point (MHAP) to assess his mental impairments and need for treatment. (Tr. 305.) At that time, Mr. Saylor reported that he was always anxious and feeling as if he were on the verge of a panic attack. *Id.* He reported memory problems, high impulsivity, problems sleeping, and appetite variations. *Id.* He further noted that he frequently felt tired and did not like to have social contact with others. *Id.* Under the Mental Status Description portion of the evaluation, the MHAP evaluator observed that Mr. Saylor appeared nervous, tense, timid, and passive. (Tr. 306, 310). His affect was flat; his mood anxious, depressed, fearful, and irritable. *Id.* His thought content was depressive and his speech was rapid. *Id.* With respect to substance use and abuse, Mr. Saylor characterized his prior six months of substance use as drinking an occasional wine cooler and smoking marijuana occasionally when he is at his mother's house. (Tr. 308). MHAP diagnosed Saylor with Bipolar Affective Disorder, Mixed; Cannabis Abuse, and Alcohol abuse - Episodic. (Tr. 305). His GAF was 50. *Id.* MHAP determined that Saylor needed ongoing case management and medical somatic treatment. (Tr. 305). Substance abuse treatment was not

recommended. *Id.*

Mr. Saylor was also evaluated by consulting psychiatrist Kevin Eggerman, M.D., in January 2007. (Tr. 313-18). Dr. Eggerman diagnosed Mr. Saylor with panic disorder (with agoraphobia), and assigned him a current GAF score of 60 (Tr. 317). He also opined that Mr. Saylor was minimally limited in his ability to understand, remember, and carry out short, simple instructions and to make judgments on simple, work-related decisions; was mildly limited in his ability to understand, remember, and carry out detailed instructions; was mildly to moderately limited in his ability to interact appropriately with the public, supervisors, and co-workers; was mildly limited in his ability to respond appropriately to changes in a routine work setting; and was moderately limited in his ability to respond appropriately to work pressures in a usual work setting. (Tr. 317).

Thereafter, Mr. Saylor treated with Greater Cincinnati Behavioral Health Services (GCB) beginning in January of 2007. (Tr. 342). His psychiatrist throughout was Maureen Hickert, MD. (Tr. 341-374, 382-402, 728-738, 751-754, 867-869). Dr. Hickert diagnosed Saylor with Generalized Anxiety Disorder, Panic Disorder with Agoraphobia, and Avoidant Personality Disorder. (Tr. 372, 751-754). The record indicates that Mr. Saylor was prescribed Zoloft, Lexapro, Lithium for his severe anxiety.

In May of 2009, Dr. Hickert added the diagnoses of Alcohol and Cannabis Abuse in Full Remission. (Tr. 728). From at least April of 2008 through the date of the administrative hearing, Dr. Hickert's assigned Mr. Saylor GAF scores of 45. (Tr. 383-385, Tr. 736, Tr. 751-754).

*2. The ALJ's decision*

As noted above, at step-two of the sequential evaluation the ALJ found Mr. Saylor's

anxiety/panic disorder, bipolar disorder, and alcohol/marijuana use (in remission) to be severe impairments. (Tr. 17). At step-three, the ALJ found that Mr. Saylor's impairments did not meet or equal any of the Listings for mental disorders. With respect to the paragraph "B" criteria, the ALJ determined that Mr. Saylor was only mildly restricted in activities of daily living; moderately restricted in social functioning; and mildly limited in maintaining concentration, persistence or pace. (Tr. 19). Specifically, the ALJ found that Mr. Saylor was mildly restrict in activities of social functioning because he reported to Dr. Eggerman that he "does dishes, takes out the trash, cleans the litter box and sweeps and mops." (Tr. 19). In finding that Mr. Saylor had only moderate difficulties in social functioning the ALJ stated:

> There is a history of alcohol and drug abuse, some reports suggesting daily, so he must be getting these substances from others on some level which suggests a more varied activity level and social interaction than alleged. Additionally, he was able to articulate his problems and answer questions at the hearing, which many people would consider a very stressful situation, without having a panic attack.

(Tr. 19)

Last, the ALJ determined that Mr. Saylor has mild difficulties with regard to concentration persistence or pace because he reported that he is "able to writ[e] for hours" and he had "no perceived difficulty with concentration at the hearing." *Id.*

In light of the foregoing and as detailed above, the ALJ determined that Mr. Saylor was capable of work at all exertional levels with certain mild to moderate restrictions in light of his mental impairments. (Tr. 20). Notably, the ALJ's RFC did not include any restrictions or exceptions related to Mr. Saylor's ability to maintain concentration, persistence or pace. In making these findings, the ALJ rejected the assessments of Mr. Saylor's treating

psychiatrist, Dr. Hickert and Anne Turner, Mr. Saylor's case manager.

Specifically, Dr. Hickert provided an assessment of Mr. Saylor's ability to perform work-related activities. Dr. Hickert listed Mr. Saylor's diagnoses as generalized anxiety disorder, panic disorder with agoraphobia, avoidant personality disorder, alcohol and cannabis abuse in full remission. (Tr. 751-754). She assigned Mr. Saylor a Global Assessment Functioning (GAF) score of 45, indicating serious symptoms. Dr. Hickert also assessed Mr. Saylor mental abilities in fourteen work-related mental functions. Dr. Hickert opined that Mr. Saylor would be "unable to meet competitive standards" due to his mental limitations in the following three areas:

- maintaining attention for a two-hour segment
- sustaining an ordinary routine without special supervision, and
- completing a normal workday and workweek without interruptions from psychological based symptoms

(Tr. 752). With respect to the "B" criteria, Dr. Hickert found Mr. Saylor has extreme limitations in activities of daily living, moderate difficulties in maintaining social functioning and marked deficiencies of concentration, persistence or pace. (Tr. 753). Dr. Hickert explained that "anxiety prevents patient from leaving his apartment more than two times a week. Racing thoughts interfere with concentration and ability to follow instructions." *Id.*

Similarly, Ms. Turner, Mr. Saylor's case manager at GCP, testified at the administrative hearing that Mr. Saylor's anxiety and panic issues would cause him problems at work during virtually every contact she had with him. (Tr. 60). Notably, she testified that when his anxiety gets bad, he has significant difficulty leaving his house and cannot do so without the support of someone in his family or Ms. Crim. (Tr. 59, 61). Ms. Turner further stated that Mr. Saylor is unable to work in a full-time, low-stress job because

he struggles to cope with stressors, keeping appointments, maintaining consistency, problem solving, being able to focus and concentrate, and following instructions without reminders. (Tr. 62). She also opined that he did not have the skills to keep a regular routine.

The ALJ gave "little weight" to the findings of both Dr. Hickert and Ms. Turner. The ALJ explained that Dr. Hickert's opinion appeared to be based on an unquestioning acceptance of Mr. Saylor's reports about his condition - specifically his poly-substance abuse. (Tr. 22). The ALJ further noted that Dr. Hickert's findings of extreme limitations in activities of daily living and marked limitations in sustaining concentration, persistence, or pace was inconsistent with Mr. Saylor's reported daily activities. (Tr. 22-23). Specifically, the ALJ noted that Mr. Saylor reported reading, playing video games, trips to the store and household chores. (Tr. 22-23). The ALJ stated that "some records show significant marijuana, alcohol and other substance abuse and he must be leaving the home to get these substances or having people constantly come over to his house in order to provide him with drugs/alcohol.

Instead, in formulating Mr. Saylor's RFC, the ALJ relied on the findings of Dr. Katz, a non-examining consultant, who reviewed Mr. Saylor's medical file in February 2007. Dr. Katz determined that Mr. Saylor could understand, remember, and carry out simple and somewhat complex tasks; could make simple decisions; could relate to co-workers and supervisors on a superficial and occasional basis only; would not be able to deal with the public in a reliable manner; could deal with occasional changes in routine; and would require a calm, consistent work setting with clear performance expectations and minimal interpersonal demands. (Tr. 323). In support of these findings, Dr. Katz listed a June 2005

emergency room report and Dr. Eggermans' consultative evaluation in discussing Mr. Saylor's mental residual functional capacity.

### C. The ALJ Erred in Weighing the Opinion Evidence

1. *Dr. Hickert*

For the reasons that follow, the undersigned finds that the ALJ failed to follow agency regulations in discounting the findings of Mr. Saylor's treating sources. As a result, the ALJ's RFC assessment is not substantially supported.

In evaluating the opinion evidence, "[t]he ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley v. Commissioner Of Social Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Wilson* v. *Commissioner,* 378 F.3d 541, 544 (6th Cir. 2004). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2).

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(d)(2); *but see Tilley v. Comm'r of Soc. Sec.*, No. 09–6081, 2010 WL 3521928, at *6 (6th Cir. Aug.31, 2010) (indicating that, under *Blakely* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20

C.F.R. § 404.1527(d)(2) for weighing medical opinion evidence within the written decision).

As such, the opinions of treating and examining sources are generally entitled to more weight than opinions of consulting and non-examining sources. 20 C.F.R. § 404.1527(d); see *also West v. Comm'r Soc. Sec. Admin.*, 240 Fed. Appx. 692, 696 (6th Cir. 2007) (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981)) ("[R]eports from treating physicians generally are given more weight than reports from consulting physicians ...."). However, an ALJ need not credit a treating physician opinion that is conclusory and unsupported. *See Anderson v. Comm'r Soc. Sec.*, 195 Fed. Appx. 366, 370 (6th Cir. 2006) ("The ALJ concluded, properly in our view, that the [treating physician's] treatment notes did not support and were inconsistent with his conclusory assertion that appellant was disabled."); *see also Kidd v. Comm'r of Soc. Sec.*, 283 Fed. Appx. 336, 340 (6th Cir. 2008) (citing *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994)) (holding that an ALJ need not credit a treating physician's conclusory opinions that are inconsistent with other evidence). Here, the reasons given by the ALJ in rejecting Dr. Hickert's assessment were not made in accordance with Agency regulations and do not find substantial support in the record.

First, with respect to the paragraph B criteria, the ALJ rejected Dr. Hickert's findings that Mr. Saylor had extreme restrictions in his activities of daily living and marked limitations regarding concentration, persistence and pace based on Mr. Saylor's reported daily activities which included, writing poetry, reading, watching movies, playing video games, using the internet and going to the store with a friend. (Tr. 22). In making this finding, the ALJ erred by selectively relying on Mr. Saylor's testimony regarding his daily activities. *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) ("[A] person's ability to engage in

personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity.") It is well recognized that a claimant's ability to perform limited and sporadic tasks does not mean that he is capable of full-time employment. *See Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004); *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001). The undersigned finds that Mr. Saylor's ability to engage in such daily activities does not establish *ipso facto* that he is able to engage in gainful activity 40 hours per week.

Next, the ALJ erred in discounting Dr. Hickert's findings based upon Mr. Saylor's alleged drug use. As detailed above, in 2009, Dr. Hickert concluded that Mr. Saylor's polysubstance abuse was in remission. Without explanation, the ALJ determined "the record suggests otherwise" and it "appears that [Dr. Hickert] was unaware of Mr. Saylor's polysubstance abuse." (Tr. 22). However, there is no evidence in the record suggesting that Plaintiff's sporadic use of alcohol or marijuana would invalidate the findings of Dr. Hickert. As noted by Plaintiff, the ALJ did not find that substance use or alcohol abuse was a contributing factor material to the determination of disability. There is only one mention in the record of alcohol or marijuana use by Saylor after January of 2007. That was in late December 2008, over the holidays, when Saylor was suffering from a confluence of several extreme stressors that resulted in a lapse of sobriety. (Tr. 818- 819). For the two months before that lapse, those stressors included the birth of a child, moving into a new apartment with bed bugs, a sick child, several migraines, several panic attacks, a sick partner (Crim), a bout of possible ulcerative colitis, moving in with Ms. Crim's parents, and having family over for Christmas. (Tr. 230-231, 484, 486, 488, 490-491, 494, 496, 736, 756). While an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between

properly submitted medical opinions, he is not permitted to make his own evaluations of the medical findings. *Mason v. Comm' r of Soc. Sec.*, No. 1:07–cv–51, 2008 WL 1733181, at *13 (S.D. Ohio April 14, 2008) (Beckwith, J.; Hogan, M.J.) (citing *Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963). Thus, it appears in making this determination, the ALJ, in part, impermissibly acted as his own medical expert. *See Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir.1985); *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir.1983); *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir.1975).

Lastly and perhaps most important, notably absent from the ALJ's analysis of Dr. Hickert's opinions is any consideration of Dr. Hickert's longitudinal treatment history of Plaintiff, as well as her objective findings.[4] The record indicates that Plaintiff treated with Dr. Hickert and other therapists at GCB for nearly three years at the time Dr. Hickert assessed Plaintiff's mental residual functional capacity. The record contains numerous treatment notes and clinical findings from GCP relating to Mr. Saylor's mental impairments. These include clinical findings such as racing thoughts, paranoid thoughts, apprehensive thoughts, irrational thoughts, obsessive thoughts, inability to focus, inability to concentrate, inability to leave the apartment unaccompanied, panicky feelings, trembling, nervous and anxious mood, disorganized thinking, confusion, isolated, and social phobias. (Tr. 341-74, 352-402, 468-675, 728-38, 751-54). Contrary to the ALJ findings, the fact that Dr. Hickert's opinions were based on Plaintiff's self-reports does not provide an adequate basis to reject

---

[4]Objective medical evidence consists of medical signs and laboratory findings as defined in 20 C.F.R. § 404.1528(b) and (c). *See* 20 C.F.R. § 404.1512(b)(1). "Signs" are defined as "anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1528(b).

such findings.  Notably, the Sixth Circuit Court of Appeals, citing *Poulin v. Bowen*, 817 F.2d

865 (D.C. Cir.1987), stated that:

> A psychiatric impairment is not as readily amenable to substantiation by
> objective laboratory testing as a medical impairment ... consequently, the
> diagnostic techniques employed in the field of psychiatry may be somewhat
> less tangible than those in the field of medicine.... In general, mental
> disorders cannot be ascertained and verified as are most physical illnesses,
> for the mind cannot be probed by mechanical devices [sic] in order to obtain
> objective clinical manifestations of medical illness.... When mental illness is
> the basis of a disability claim, clinical and laboratory data may consist of the
> diagnosis and observations of professionals trained in the field of
> psychopathology. The report of a psychiatrist should not be rejected simply
> because of the relative imprecision of the psychiatric methodology or the
> absence of substantial documentation, unless there are other reasons to
> question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121, (6th Cir.1989).  In *Blankenship*, the Sixth

Circuit concluded that no cause existed to question the diagnosis of a psychiatrist made

after only one interview and where no psychological testing had been conducted and even

though the doctor noted the need for a more accurate history.  *Blankenship*, 874 F.2d at

1121.  Thus, interviews are clearly an acceptable diagnostic technique in the area of mental

impairments and Dr. Hickert could rely upon the subjective complaints elicited during her

treatment sessions with Plaintiff in formulating Plaintiff's functional restrictions.   See

*Warford v. Astrue*, No. 09-52, WL 3190756, at *6 (E.D .Ky. Aug. 11, 2010) (finding

interviews are an acceptable diagnostic technique in the area of mental impairments).

In sum, the ALJ's conclusory statements lack merit and fail to meet the requirement

that the ALJ "give good reasons" for not giving weight to a treating physician.  *See Wilson,*

378 F.3d at 545.  Furthermore, as noted above, in weighing the various opinions and

medical evidence, the ALJ must consider pertinent factors such as the length, nature and

extent of the treatment relationship, the frequency of examination, the medical specialty of

the treating physician, the opinion's supportability by evidence, and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6). Here, however, it is unclear from the ALJ's decision whether he applied any or all of such factors, in light of his selective reliance on Mr. Saylor's daily activities and purported inconsistent statements relating to his drug use.

### 2. *Dr. Katz*

Plaintiff also argues that the ALJ improperly relied on the findings of Dr. Katz. Specifically, Plaintiff maintains that the record contains 281 pages of treatment notes that were generated after Dr. Katz reviewed the file. As noted above, Dr. Katz, a non-examining consultant, reviewed Mr. Saylor's medical file in February 2007. Dr. Katz determined that Mr. Saylor could understand, remember, and carry out simple and somewhat complex tasks; could make simple decisions; could relate to co-workers and supervisors on a superficial and occasional basis only; would not be able to deal with the public in a reliable manner; could deal with occasional changes in routine; and would require a calm, consistent work setting with clear performance expectations and minimal interpersonal demands. (Tr. 323). In his evaluation of Dr. Katz' findings, the ALJ's decision states in relevant part:

> The undersigned concurs with the determination of the state agency. The residual functional capacity finding of this decision is based in large part on the state agency [Dr. Katz'] assessment, in addition to the objective medical evidence in the file and the few credible portions of the testimony presented at the hearing.

(Tr. 22).

The ALJ does not offer any additional analysis of Dr. Katz's findings nor identify any objective medical evidence or testimony in support of this conclusion. Upon careful review,

the ALJ's reliance on Dr. Katz' finding is also erroneous.

In *Blakely v. Commissioner of Social Security*, 581 F.3d 399, 408-409 (6th Cir. 2009), as in this case, the ALJ credited the opinions of the state agency physicians over the opinion of the Mr. Saylor's treating physician. The Sixth Circuit held that "[i]n appropriate circumstances, opinions from State agency medical...consultants...may be entitled to greater weight than the opinions of treating or examining sources." (*Id.* at 409, quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996)). However, in *Blakely* the court reversed on grounds that the state non-examining sources did not have the opportunity to review "much of the over 300 pages of medical treatment...by Blakely's treating sources," and that the ALJ failed to indicate that he had "at least considered [that] fact before giving greater weight" to the consulting physician's opinions. *Blakely*, 581 F.3d at 409 (*quoting Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)). Nevertheless, the Sixth Circuit reiterated the general principle that an ALJ's failure to provide adequate explanation for according less than controlling weight to a treating source may be excused if the error is harmless or *de minimis*, such as where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it." *Id.* at 409 (*quoting Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004)). Under *Blakely*, then, an ALJ may choose to credit the opinion of a consultant who has failed to review a complete record, but he should articulate his reasons for doing so. If he fails to provide sufficient reasons, his opinion still may be affirmed if substantial evidence supports the opinion and any error is deemed to be harmless or *de minimis*.

Here, Dr. Katz's assessment was not based on a complete record as he did not consider later-acquired objective evidence, including treatment notes and clinical findings

obtained from Mr. Saylor's treating sources.  Although the ALJ's decision indicates that he considered the opinion evidence in the record obtained after Dr. Katz' assessment, there is no indication that the ALJ considered the fact that Dr. Katz failed to review a complete record as required by *Blakely*.  Furthermore, as outlined above, the ALJ improperly considered the later-acquired evidence based on his selective review of Mr. Saylor's daily activities.

Additionally, the ALJ's decision does not clearly explain why he relied on Dr. Katz' findings.  As detailed above, the ALJ simply states that he concurs with Dr. Katz' assessment as it is consistent with the objective evidence and portions of testimony found credible by the ALJ.  However, the ALJ fails identify the objective evidence and or testimony in support of this conclusion preventing the Court from engaging in meaningful review of the decision in this regard.  *See Hurst v. Secretary of Health and Human Services*, 753 F.2d 517 (6th Cir. 1985) (articulation of reasons for disability decision essential to meaningful appellate review); Social Security Ruling (SSR) 82-62 at *4 (the "rationale for a disability decision must be written so that a clear picture of the case can be obtained").

Thus, on the record presented the ALJ's adoption of an RFC based primarily upon the report of a single consulting physician was clear error.  Aside from improperly factoring in Mr. Saylor's drug and alcohol use and selective reliance on Mr. Saylor's daily activities—the ALJ did not discuss any basis for accepting Dr. Katz' opinions over the opinions of Plaintiff's treating sources.  *See* 20 C.F.R. § 404.1527(d)(2), § 1527(d)(2); *see also Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir.2009) (reversing where only stated reason for rejection of limitation was disagreement of another physician).

**D. Listing 12.06**

Plaintiff further argues that the ALJ erred in failing to find that Mr. Saylor's mental impairments, met or medically equaled the requirements of Listing 12.06. The undersigned agrees.

When a claimant claims disability from a mental impairment, an ALJ must rate the degree of functional limitation resulting from that impairment with respect to "four broad functional areas," including: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§404.1520a(b)(2), (c)(3). These four areas are commonly referred to as the "B criteria." *See Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009)(citing 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00 et seq.). In order to meet the paragraph "B criteria" a claimant must be markedly limited in two of the four categories.

In this case, the ALJ rated Plaintiff's functional impairment in each of the four "B criteria" areas before concluding that Plaintiff did not meet or equal Listing 12.06. The ALJ concluded that the paragraph B criteria was not met because he believed that Plaintiff was only mildly restricted in activities of daily living; moderately restricted in social functioning; and mildly limited in maintaining concentration, persistence or pace.

However, as fully explained above, in finding that Mr. Saylor's anxiety related impairments did not meet or equal Listing 12.06, the improperly ALJ discounted the assessments of his mental health limitations by treating sources, testimony by Mr. Saylor's case manager and Mr. Saylor himself. With respect to the "B" criteria, Dr. Hickert found Mr. Saylor has extreme limitations in activities of daily living, moderate difficulties in maintaining

social functioning and marked deficiencies of concentration, persistence or pace. (Tr. 753). Dr. Hickert explained that "anxiety prevents patient from leaving his apartment more than two times a week. Racing thoughts interfere with concentration and ability to follow instructions." *Id.* Thus, Dr. Hickert concluded that Plaintiff was markedly limited in two of the four categories of the B criteria. This finding is consistent with the evidence of record which shows that Mr. Saylor was overwhelmed by his anxiety. Such findings are supported by treatment notes from GCB, Mr. Saylor's testimony and the non-medical evidence including Mr. Saylor's employment history and work attempts.[5]

### III. Conclusion and Recommendation

When the non-disability determination is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan,* 501 U.S. 89, 100 (1991).

Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176; *see also Abbott,* 905 F.2d at 927; *Varley,* 820 F.2d at 782. The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher,* 17 F.3d at 176; *see also Felisky,* 35 F.3d at 1041; *Mowery v. Heckler,* 771 F.2d 966, 973 (6th

---

[5] Notably, Mr. Saylor did not drive, rarely left his home, experienced frequent anxiety/panic attacks and racing thoughts.

Cir.1985). Such is the case here.

Here, proof of disability is strong and remand will serve no purpose other than delay. Accordingly, this matter should be remanded for an award of benefits. As discussed above, based upon the treatment notes from GCB and the assessments of Dr. Hickett and Ms. Turner, Mr. Saylor's severe psychiatric condition prevented him from sustaining gainful employment. The only question in this case is the appropriate onset date of disability. Upon careful review, it appears that Mr. Saylor amended his onset date of disability to June 18, 2005 at the administrative hearing. (Doc. 33-34). Such date appears to be supported by the record. However, since the determination of the onset date of disability is a factual issue, this matter should be remanded solely for a determination of the appropriate onset date and an award of benefits.

For the reasons explained herein, **IT IS RECOMMENDED THAT**:

1. The decision of the Commissioner to deny Mr. Saylor DIB benefits be **REVERSED** and this matter be **REMANDED** under sentence four of 42 U.S.C. §405(g) for for a proper determination of Mr. Saylor's disability onset date and immediate award of benefits consistent with this Report and Recommendation;

2. As no further matters remain pending for the Court's review, this case be **CLOSED.**

　　　　　　　　　　　　　　　　　　 /s Stephanie K. Bowman
　　　　　　　　　　　　　　　　　　Stephanie K. Bowman
　　　　　　　　　　　　　　　　　　United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

LESLIE CRIM,                                          Case No. 1:11-cv-137

        Plaintiff,                                  Dlott, C.J.
                                                 Bowman, M.J.

      v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).